Southwick W. BRIGGS and Stone Filter Company, Incorporated, Plaintiffs-Appellees,

v.

M & J DIESEL LOCOMOTIVE FILTER CORP., Defendant-Appellant.

Southwick W. BRIGGS and Stone Filter Company, Incorporated, Plaintiffs-Appellees,

v.

SUPERIOR DIESEL FILTER COMPANY, Barbara A. Giacobbe (nee Bair), Clara A. Bair, Irwin R. Bair and Dorothy Bair Nichols, Defendants-Appellants.

Southwick W. BRIGGS and Stone Filter Company, Incorporated, Plaintiffs-Appellees,

v.

ALLIED FILTER ENGINEERING, INC., Defendant-Appellant.

Nos. 14683–14685.

United States Court of Appeals Seventh Circuit.

March 10, 1965.

Rehearing Denied April 5, 1965.

Edwin A. Rothschild, Edward W. Osann, Jr., James M. Goff, Phillip H. Mayer, Richard Harris and Gerald J. Sherman, Chicago, Ill., Sonnenschein, Levinson, Carlin, Nath & Rosenthal, Wolfe, Hubbard, Voit & Osann, Chicago, Ill., of counsel, for appellants.

Walther E. Wyss, Robert L. Rohrback, and M. Hudson Rathburn, Chicago, Ill., Mason Kolehmainen, Rathburn & Wyss, Chicago, Ill., of counsel, for appellees.

Before DUFFY, CASTLE and SWYGERT, Circuit Judges.

CASTLE, Circuit Judge.

Southwick W. Briggs and Stone Filter Company, Incorporated, (Stone) plaintiffs-appellees, the owner and licensee, respectively, of Briggs Patents Nos. 2,-395,449 and 2,919,807 [1] brought suits in the District Court charging each of the defendants-appellants [2] with infringement of certain claims of the patents [3] and seeking injunctive relief and damages. The defendants denied infringement and asserted invalidity of the patents. The three actions were consolidated for trial.

Following a trial before the court without a jury, the District Court filed a memorandum of decision incorporating its findings of fact and conclusions of law. The court held the patent claims in suit valid and infringed and entered judgment orders granting injunctive relief against infringement of the designated claims of the '807 patent and decreeing that damages would be assessed for infringement of all of the claims in suit in an amount to be determined at a further hearing. The defendants appealed.

The main issues presented by the defendants' contentions on appeal are:

(1) Whether the District Court erred in finding and concluding that the claims in suit of the '807 patent (a) were valid as meeting the definiteness requirements of Section 112 of the Patent Act; (b) were not anticipated in the prior art; and (c) were infringed by the accused device.

(2) Whether the court erred in finding and concluding that the claims in suit of the '449 patent (a) were not anticipated in the prior art; (b) were not invalid for double patenting; and (c) were infringed by the accused device.

■ Insofar as the detailed findings of the court concern factual issues such as the use made of prior art, the nature of the improvement made over prior art, the characteristics and operational functions of the patented structure and the accused device, and the method employed in the production of the accused device, Rule 52(a) of the Federal Rules of Civil Procedure (28 U.S.C.A.) applies. The court heard the testimony of expert witnesses in connection with these matters. The scope of our review of such findings is therefore limited to a determination of whether or not they are "clearly erroneous". Armour & Co. v. Wilson & Co., 7 Cir., 274 F.2d 143, 156; Minnesota Mining and Mfg. Co. v. Technical Tape Corp., 7 Cir., 309 F.2d 55, 57; Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 753. If they find support in the evidence we are bound thereby and there remains but the question of whether or not the court applied the correct legal criteria in reaching the ultimate conclusions it did.

The record discloses that the accused device is a pleated paper filter designed and used for filtering the lubricating oil in diesel locomotives. It is about thirty inches in length and employs corrugated, resin impregnated, radially pleated, paper wrapped around a perforated center tube or core of metal. The corrugations or ribs extend radially of the core to form well defined grooves. The outer edges of the pleats are bonded with a thermoset-

---

1. Hereinafter referred to as the '449 patent and the '807 patent. The '449 patent expired February 26, 1963, a few months after the suits were filed.

2. The defendant-appellant in No. 14683, M & J Diesel Locomotive Filter Corp., (M & J) is a vendor of the accused device. The defendant-appellant in No. 14684, Superior Diesel Filter Company, a partnership (Superior) is also a vendor of the accused device. Barbara A. Giacobbe (nee Bair), Clara A. Bair, Irwin R. Bair and Dorothy Bair Nichols were partners in Superior at the time suit was commenced. The complaint was dismissed as to additional individual defendants Stanley G. Bair and J. R. McGrath. The defendant-appellant in No. 14685, Allied Filter Engineering, Inc., (Allied) manufactures the accused devices and sells them to M & J and Superior.

3. The complaints charged infringement of claims 9, 10, 11 and 12 of the '449 patent; and infringement of claims 4, 6, 8, 9, 10 and 11 of the '807 patent.

ting adhesive to an outer permeable perforated paper cover. The inner edges contact each other and the core. In the manufacture of the filter at the Allied plant the resin impregnated, corrugated filter paper is fed from rolls to a Chandler pleater, a commercial paper pleating machine. The pleated paper is passed through a curing oven which cures or sets the resin in the paper and it is then cut. A flat, perforated cover sheet is coated with thermosetting adhesive and placed over the edges of the pleats. This assembly is then placed under a flat heated platen which presses the cover sheet against the pleated paper while heating and setting the adhesive so as to bond the cover sheet to the pleated paper. The assembly is then folded around a center tube, adhesive is applied to the overlapping portions of the cover sheet, and the unit is then passed through a rigid side-seam sealer tube containing a heating element to set the adhesive of the cover seam to form a tubular assembly. End caps are then affixed.

The '807 patent is addressed to what is described therein as the problem encountered in filters utilizing pleated filter paper produced by commercial paper pleating machines. The patent recites that substantially all such machines produce variations in the depths of the pleats, although the pleats projecting in the same direction have peaks lying substantially in a single plane. The problem encountered is described as the tendency of adjacent pleats to stick together with the consequence that effective filter surface diminishes to a point where it is inadequate to cope with the conditions for which the filter was designed. The claims in suit read:

"4. A filter comprising a permeable impregnated paper filter element having axial pleats with walls of unequal depths defining a plurality of inner and outer peaks, said outer peaks being spaced apart and lying substantially in a cylinder, a substantially uniformly permeable core disposed within said element for engagement with said inner peaks, an annular cover member permeable substantially throughout its length embracing said outer peaks throughout their length, and an adhesive bonding said cover member to said outer peaks.

*      *      *      *      *      *

"6. A filter as set forth in claim 4 wherein said adhesive is thermosetting.

*      *      *      *      *      *

"8. A filter as set forth in claim 4 wherein said walls are under stress.

"9. A filter as set forth in claim 4 wherein said inner peaks engage said core and certain of said walls are bowed.

"10. A method of maintaining adjacent pleats of an annular filter element in spaced relationship comprising circumscribing said element with a cover member and simultaneously shrinking said cover member about and bonding it to peripheral portions of said pleats.

"11. A method as set forth in claim 10 wherein said shrinking and bonding are effected at a superatmospheric temperature."

Claims 10 and 11 of the '807 patent are directed to a method of making filters using a simultaneous shrinking and bonding process to maintain adjacent pleats of an annular filter element in spaced relationship. Claims 4, 6, 8 and 9 are directed to the filters manufactured by this method using a paper filter element having axial pleats with walls of unequal depths.

The '449 patent relates to a filter element for use in tubular filters for oil and other liquids. The filter element is of material, folded or pleated, and having grooves extending radially of the pleats to provide passage for the flow of the liquid being filtered even though the pleats or folds are in contact with each other. It thus insures effective use of the maximum area of filtering surface. Claims 9, 10, 11 and 12 of the '449 patent are directed to a filter element in the

form of a tubular body comprising a web of grooved or ribbed filter material, including cellulosic filter material or cellulosic wadding, folded to extend back and forth between the inner and outer peripheral surfaces of the tubular body, with the folds of the web at the inner surface of the tubular body being juxtaposed and in contact with each other. The grooves in the material or the space formed by the contacting ribbing provide a passage for the flow of liquid between the contacting pleats or folds.

The District Court found, in substance, that the invention of the '807 patent is the securing of the outer peaks of the pleats to the cover by adhesive bonding, where the walls of the pleats are of such unequal length that the shorter pleats would not ordinarily engage the cover, by shrinking the cover about the pleats while bonding it and thereby bringing the cover and its adhesive layer against the outer peaks of the shorter pleats while bowing or stressing the longer pleats, thus achieving the desired bonding of all pleats and the elimination of the problem incident to pleat collapse— the tendency of adjacent paper pleats to stick together.

The District Court found, in substance, that the novel element of the '449 patent is the use of grooves, or ribbing to form grooves, in folded or pleated filter material which permit fluid flow in the areas of contact which otherwise would have stopped or impeded utilization of such areas for effective filtering.

Defendants assail the court's findings and conclusions with respect to the '449 patent and concerning its infringement by defendants' filters on the grounds that grooves formed by ribbing were obvious in view of prior art disclosures anticipating the passage function of such grooves; that the claims in suit are invalid for double patenting for the reason that Briggs' earlier but copending Patent No. 2,321,985 disclosed "well defined" grooves or channels in filter material, including cellulose wadding; that lack of utility or usefulness is established by lack of commercialization of the design; and that the corrugated filter paper used in the defendants' accused device is not a grooved or ribbed material embraced by the claims in suit.

None of the prior art patents [4] upon which defendants now place reliance employs radial grooves or ribbing as called for in the claims of the '449 patent here under consideration. None was addressed to the problem of providing passage for fluid flow between contacting pleats or folds of the filter material to assure against loss of those areas as effective filter surface. None disclosed pleats crowded together near the center and this is the feature which gives rise to the necessity for radial grooves in the filter material to prevent loss of filtering area in the regions where the pleats engage. The prior art patents conceded by defendants' expert witness to be the most pertinent references against the '449 patent were three patents cited by the Patent Office (Briggs patents 2,092,548 and 2,321,985 and Vokes British patent No. 401,287). The following observation made by this Court, speaking through Chief Judge Hastings, in Ekstrom-Carlson & Co. v. Onsrud Machine Works, Inc., 7 Cir., 298 F.2d 765, 768, is applicable:

"Defendant's own expert, Dr. Ziegler, admitted that Clay No. 2,339,-001 and Taylor No. 2,069,189 were the 'two best references' referred to by defendant. Both of these patents were cited as references in the file wrapper of the patent in suit and were considered and rejected by the Patent Office. The trial court was justified in relying upon the presumption of validity attached to the finding of invention by the Patent Office, and under the foregoing circumstances this presumption is greatly reinforced."

The trial court correctly found that the defendants' reliance upon Briggs' own

---

4. Greene Patent No. 1,639,133; Poelman Patent No. 2,122,111; Vokes British Patent No. 401,287, and Briggs Patent No. 2,092,548.

earlier patent 2,092,548, as being anticipatory is misplaced. The ribs and grooves of the cellulose wadding filter element there disclosed extended lengthwise of the filter rather than radially, they were employed to strengthen the filter material so as to prevent sagging and mushing which would lessen permeability, and although the corrugating process incidentally increased the surface area of the wadding and the liquid filtered could flow in the grooves they were not designed for that purpose, and the patent neither disclosed nor taught the utilization of radial grooves to permit fluid flow through areas where the pleats of a pleated filter element were in crowded contact.

Nor are we persuaded that the court erred in rejecting the defendants' contention that the '449 patent was invalid for double patenting. While copending applications of the same inventor are not prior art to each other, under the doctrine of double patenting, "the claim of the later patent [here '449] must show an invention beyond the claim of the first". Weatherhead Co. v. Drillmaster Supply Co., 7 Cir., 227 F.2d 98, 102. The court properly found and concluded that the claims in suit of the '449 patent show invention beyond the claims of the '985 Briggs patent. The '985 patent concerns a filter element of ribbed cellulose wadding, rolled to form multiple layers, with the resulting channels formed between the layers running lengthwise of the element. The fluid flows downward through the channels, and the solids in the fluid are separated out by being deposited upon fibers of the wadding. Defendants argue that the use of grooves formed by ribs to channel the flow of fluid cannot be the "invention" of '449 because it was the "invention" of '985. But defendants' expert, Mr. Lauer, conceded that the only similarity between the two patents is that each of them "employ in quite different ways filter material that is ribbed". Defendants' argument isolates the only common

feature of the two patents and overlooks that the '985 method and structure was designed to prevent transverse flow of fluid through the filter material—the feature the grooves employed in '449 are designed to facilitate.

The commercial success which the record shows has been enjoyed by plaintiff Stone's commercial structure, which employs radial grooves formed by corrugations in the manner and for the purpose disclosed and taught by the '449 patent, and defendants use of such feature in the accused device,[5] deprives defendants' argument that the concept of '449 lacked utility or usefulness of any persuasive weight. Moreover, the fact that until the advent of Stone's commercial structure employing the method and apparatus of the '807 patent, and incorporating the invention of '449 as well as the invention of '807, no commercial structure had been produced from the '449 patent is insufficient to establish lack of invention in the '449 patent. Lack of commercial success does not of itself establish lack of invention or preclude enforcement of a patent. Aerosol Research Company v. Scovill Manufacturing Co., 7 Cir., 334 F.2d 751, 756; Edward Valves, Inc. v. Cameron Iron Works, Inc., 5 Cir., 286 F.2d 933, 939.

The expert testimony adduced amply supports the court's findings and conclusions that the corrugated filter paper employed in the accused device is a grooved or ribbed cellulosic material embraced in the claims of the '449 patent. The paper is a filter material; it is ribbed or grooved radially; it is a cellulosic material. And, it is the equivalent of the "ribbed cellulosic wadding" covered in claim 12. It performs the same function in the same way.

We turn to consideration of the defendants' contentions addressed to the District Court's findings and conclusions with respect to the '807 patent and its infringement by the defendants' filters.

---

5. The trial court specifically found that until the defendants began to employ radial pleats juxtaposed at the inner edges along with ribs or grooves running radially of the tubular body, their device met with little success.

The defendants contend the '807 patent is invalid for indefiniteness, is anticipated in the prior art, and is not infringed by the accused device.

■■ Defendants urge that the '807 patent is invalid because it violates the requirements of 35 U.S.C.A. § 112 that it describe the invention "in such full, clear, concise, and exact terms as to enable any person skilled in the art * * * to make and use the same," and that the "specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention". Defendants point to the fact that the patent, in both its method and apparatus claims, is directed to the use of pleated filter paper having "pleats with walls of unequal depths" and assert that neither the claims nor the specifications prescribe or suggest any standard, by way of definition, measurement or otherwise, for determining what is meant by "unequal". It is contended that the lack of such definitive criterion is violative of Section 112. The lack of a specific dimension or range defining the inequality of the pleats is the common thread which runs through the arguments defendants advance as to the invalidity of the '807 patent for indefiniteness and for anticipation in prior art, and in support of their claim of non-infringement. The defendants assert that the method claims are likewise fatally indefinite in failing to specify the amount of shrinkage and in failing to recite a time period during which the simultaneous bonding and shrinkage occur.

We have had occasion to observe that patent claims and specifications are addressed to those skilled in the art. In Binks Manufacturing Company v. Ransburg Electro-Coating Corporation, 7 Cir., 281 F.2d 252, 256–257, this Court stated:

"We find no merit in plaintiff's contention that the method claims fail to satisfy the requirements of the patent statute (35 U.S.C.A. § 112) because they merely cite a desired result rather than the means for producing the same, and because of incompleteness due to failure to specify voltages, spacing, and liquids to which they are applicable. The process claims define the specific steps of procedure and the specifications being addressed to those skilled in the art (Highway Appliances Co. v. American Concrete Expansion Joint Co., 7 Cir., 93 F.2d 113) need not recite details." * * *

\* \* \* \* \*

"There is no requirement that quantitative values for such factors as voltage, spacing and liquid characteristics be recited. The fact that experimentation or the exercise of judgment is necessary to adapt a patented process to particular material or to obtain the particular results desired does not impair validity of the patent. Lever Bros. Co. v. Procter & Gamble Mfg. Co., 4 Cir., 139 F.2d 633, 638–639."

Method claims 10 and 11 of the '807 patent when read in the light of the specifications define the steps of procedure and there is no requirement that they detail the time necessary to complete the bonding or the exact dimensions of the shrinkage.

And, as to the contention concerning the failure to detail or define the degree of or the range of the inequality or lack of uniformity in pleat wall depths the rationale of Binks is equally applicable. Moreover, the record discloses that the defendants use a Chandler pleating machine which in pleating filter paper of the type employed in the production of defendants' filters produces pleats with walls of unequal depths—in some instances as much as $\frac{1}{16}$ of an inch—depending upon the speed of operation of the pleater, the freshness of the paper, and the braking force applied. The testimony that the Chandler pleater produces inequality in the depth of pleat walls is undisputed. And, defendants in their brief acknowledge that the filter paper used is thick, soft and rough; that it cannot be folded with absolute precision. It was reasonable for the court to conclude from the testimony that those skill-

ed in the art would understand from the patent that pleats varying in depth by an amount which would preclude bonding of the peaks to the cover without a bowing or stressing of the longer pleats to accommodate the bonding of the peaks of the shorter pleats are "unequal within the meaning and scope of the claims in suit. Moreover, the patent is addressed to the degree of non-uniformity of pleat wall depth occurring from the use of commercial pleating machines to pleat resin impregnated filter paper. The evidence shows such paper to be soft and stretchable. Those skilled in the art would be conversant with the range of inequality of pleat depth involved. We perceive no error in the court's findings and conclusions that the patent claims are not invalid for indefiniteness. The patent discloses that the lack of uniformity in pleat wall depths referred to is that encountered in practical reality in the process of pleating filter paper on commercial paper pleating machines. The patent solves the problem involved in the bonding of the peaks of such pleats to the cover of an annular filter unit.

The prior art relied upon as anticipatory of the '807 patent consists of Poelman Patent No. 2,122,111; Bell Patent No. 2,642,187; Kasten Patent No. 2,-683,536; Gretzinger Patent No. 2,689,-652; Fricke et al. Patent No. 2,749,265; Foust Patent No. 2,914,179; and an oil filter manufactured by the National Filter Company under the Foust patent. All of the prior art, singly and in combination, was the subject of detailed analysis and findings made by the trial court. We perceive no error in its rejection as non-anticipatory. The Fricke patent specifies *uniform* pleats. None of these patents except Foust recognized the problem of pleat collapse. As to the others it appears that such problem was not involved. Poelman is an air or gas mask filter. Unlike a filter for liquids, there would be little tendency for its pleats to move together. Foust teaches the use of a stiffening finger inserted in each pleat to prevent collapse. None of the patents disclosed the use of pleated filter

material represented to have pleats of uneven depths, or the stressing or bowing of such pleat walls to permit bonding of the cover to all peaks in order to prevent pleat collapse. None taught a method of simultaneously shrinking and bonding the cover to uneven peaks. The same observations are true with respect to the National filter. Moreover, it proved unsatisfactory and its manufacturer went out of business.

In relying on this prior art defendants argue that the patents cited, with the exception of Fricke, do not specify "uniform pleats" and that in practical commercial reality precise uniformity is impossible. From this premise they conclude that the pleats disclosed in the prior art are "unequal" and such prior art is anticipatory. But there is nothing in the record which establishes that filter paper cannot be pleated with uniformity to such tolerances as will permit the adhesive bonding of all peaks to a cover without resort to the method of the patent claims in suit. Perhaps, from a commercial standpoint it is not economically feasible to do so. The record does establish that the Chandler pleater does not achieve such uniformity. And there is no evidence that the patent's recital that "[s]ubstantially all commercial paper pleating machines produce variations in the depths of the pleats" [which gives rise to the pleat collapse problem] is contrary to fact. And, it is an advance in the art—a distinct improvement—to overcome adverse conditions which are incidental to a current imperfect stage of manufacturing technique in order to achieve accelerated commercial production. As hereinbefore pointed out, we are of the opinion that the District Court was correct in equating the inequality of pleat depths of the patent recitals and claims with that resulting from the use of commercial paper pleating machines, such as the Chandler pleater, to pleat filter paper. Defendants reliance upon the prior art cited is predicated upon the false premise that the pleats disclosed therein were intended to be produced by the use of commercial

paper pleating machines rather than by techniques which resulted in uniformity within tolerances which would permit of the bonding of all peaks to a cover without infringement of the patent claims in suit.

In addition, the defendants' expert witness conceded that the two most pertinent references against the '807 patent are the Fricke Patent No. 2,748,948, cited by the Patent Office, and Fricke Patent No. 2,749,265, identified in the specifications of the '807 patent. Here, again, the observation hereinbefore quoted from Ekstrom-Carlson is applicable.

The District Court's conclusion that the patent claims in suit are imbued with the quality and attributes of invention is reinforced by the commercial success attained by the plaintiffs' commercial structure and the activities of the defendants which followed. Plaintiffs' commercial structure, manufactured and sold by Stone, is a pleated paper filter designed and used for filtering the lubricating oil in diesel locomotives. It corresponds to the claims in suit both in structure and in the method employed in its manufacture. The record establishes that prior to the advent of plaintiffs' pleated paper filters in 1958 cotton waste filters were used almost exclusively by the railroads in their diesel locomotives. Both M & J and Superior were major manufacturers of cotton waste filters. The useful life of a cotton waste filter in a diesel engine was about fifteen days and it retained about two gallons of oil when discarded. A study by one railroad indicated that eighty percent of the total lubricating oil consumption was make-up oil to replace that lost when filters were changed, and that the cotton waste, depth type filters, were not achieving adequate filtration and could not pass the full flow of engine lubricating oil.

In 1956 plaintiffs Briggs and Stone began a program to develop a satisfactory lubricating oil filter for diesel locomotives utilizing pleated paper filters. This culminated in the plaintiffs' commercial structure, and in the '807 patent issued January 5, 1960. The plaintiffs' pleated paper filter is designed to operate for thirty days or more and it retains but one-fourth as much oil as does the cotton waste filter. Plaintiffs were selling their filter to the railroads at the rate of 120,-000 a year when, in March 1961, defendants sold their first pleated paper filter.

The trial court's findings that the accused device manufactured by Allied, and sold by M & J and Superior, incorporates the elements and features of the claims of the patents in suit are amply supported by the record. Testimony and exhibits establish its identity with the structure defined by the claims in suit and represented by plaintiffs' commercial structure. The difference between the commercial products—in the shape of the cover perforations and the use of a metal center core or tube in defendants' filter in lieu of the hardpaper or cardboard tube employed by plaintiff Stone's filter— are superficial and immaterial. And, there is expert testimony that in the manufacturing process employed by Allied the cover paper grows when moistened by the adhesive applied thereto and that in the bonding and side-seam sealing process it shrinks, and the pleats are stressed or bowed, as the heat applied drives off the moisture and drys the cover, then in contact with and circumscribing the pleated filter element. There is evidence that the shrinkage of the cover paper bows or stresses the pleats to achieve contact of all pleats with the cover paper and their bonding thereto. Measurements made at the trial evidenced shrinkage of as much as an eighth of an inch in the diameter of the tubular filter assembly. The record, in our opinion, fully supports the trial court's conclusion that both the apparatus and method claims are infringed by the accused device.

We conclude that the factual findings of the District Court find substantial support in the record and that its conclusions of law represent the application of correct legal criteria. The judgment orders appealed from are affirmed.

Affirmed.